No. 24-10359

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ROY KINARD III,

*Plaintiff-Appellant,*

*v.*

THE FLORIDA DEPARTMENT OF CORRECTIONS, ET AL.,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Middle District of Florida, Jacksonville Division
No. 3:22-cv-00897 (Hon. Marcia Morales Howard, U.S. District Judge)
_____

## OPENING BRIEF
_____

Samuel Weiss
RIGHTS BEHIND BARS
416 Florida Avenue NW, #26152
Washington, DC 20001
202-455-4399
sam@rightsbehindbars.org

*Counsel for Plaintiff-Appellant Roy Kinard*

May 6, 2024

**CERTFICIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Local Rules 26.1-2, Plaintiff-Apellant certifies that the following persons have or may have an interest in the outcome of this case or appeal:

1. Bentley, Michael James

2. Bradley Arant Boult Cummings, LLP

3. Centurion of Florida, LLC

4. Hanson, Jacob

5. Howard, Marcia M. U.S. District Judge

6. Kinard, Roy David

7. Cordero, Doctor Asbelti Llorens

8. Mayfield, Robert

9. Rights Behind Bars

10. Toomey, Joel Barry U.S. Magistrate Judge

11. Wahl, Brian

12. Weiss, Samuel

Plaintiff-Appellant further states that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

Dated: May 6, 2024

/s/ *Samuel Weiss*
Samuel Weiss

*Counsel for Plaintiff-Appellant*

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff-Appellant Roy Kinard requests oral argument. Oral argument would aid the Court in evaluating Kinard's claims under the Americans with Disabilities Act, Rehabilitation Act, and Eighth Amendment, particularly the important question of whether the Seventh Circuit's decision in *Bryant v. Madigan* should be extended to this Circuit, which has only done so in unpublished opinions.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .................................................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CITATIONS ....................................................................................... v

JURISDICTIONAL STATEMENT ....................................................................... 1

STATEMENT OF THE ISSUES ............................................................................ 1

STATEMENT OF THE CASE ............................................................................... 1

SUMMARY OF ARGUMENT ............................................................................... 7

ARGUMENT ........................................................................................................... 9

  I.  Kinard Stated a Claim Under the ADA ...................................................... 9

    A) Kinard was denied meaningful access to prison services ........................ 9

    B) The district court erred in holding that Kinard sought accommodations that are not actionable under disability law ........................................................ 15

  II.  The District Court Erred in Dismissing Kinard's Eighth Amendment Claims ……………………………………………………………………...22

CONCLUSION ...................................................................................................... 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

**STATEMENT OF JURISDICTION**

Plaintiff-Appellant Roy Kinard appeals from a judgment dismissing his case with prejudice entered by the U.S. District Court for the Middle District of Florida on January 22, 2024. ECF No. 61 at 1 (App. 81). The district court had subject-matter jurisdiction over his claims under 28 U.S.C. § 1331. In accordance with Federal Rule of Appellate Procedure 4(a), a timely notice of appeal was filed on February 22, 2024. ECF No. 62 (*see also* App. 6). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

**STATEMENT OF THE ISSUES**

I.    Whether Kinard stated a claim under the ADA by alleging that Defendants did not accommodate his fractured foot in a way that prevented him from accessing many of the prison's services without excruciating pain.

II.    Whether Kinard stated a claim under the Eighth Amendment against Dr. Cordero.

**STATEMENT OF THE CASE**

On March 24, 2022, Plaintiff Roy Kinard was walking down a flight of stairs in his prison dorm when he slipped on a puddle of water from the facility's leaking roof. ECF No. 33 at 8 (App. 40). He flew up into the air and landed on top of his left foot, which was fractured as a result of the accident. *Id.* Immediately after the fall,

his foot began to swell and turned "blood red." *Id*. Dorm officers did nothing to assist Kinard in getting medical treatment. *Id*.

Three days later, because Kinard could barely walk, a sick call request was placed. *Id*. However, Kinard was not called to see medical until April 7, 2022, fourteen days after he fell. *Id*.

On April 7, 2022, Nurse Gilbert assessed Kinard; upon seeing the swelling and "black and red discoloration" of Kinard's foot, she was alarmed that he had not yet been seen by medical staff and told him his injury should have been treated as a medical emergency. *Id*. at 9 (App. 41). She took Kinard to the doctor on duty, who gave him crutches and ibuprofen, and told him he would be scheduled for an x-ray in four days. *Id*. The x-ray was not provided. *Id*.

On April 12, 2022, Kinard was called to medical and seen by Dr. Cordero[1] and Nurse Putnam. They wrapped his foot in an ace bandage and gave him a pass for two weeks of bed rest. *Id*. Four days later, and nearly a month after his fall, he finally received x-rays. *Id*.

On April 28, 2022, having heard nothing more from medical about the outcome of his x-rays or the anticipated treatment for his injury, Kinard was

---

[1] This defendant's full name is Dr. Asbelti Llorens Cordero. ECF No. 60 at 1 (App. 56). Kinard refers this defendant as Dr. Llorens throughout the Amended Complaint. The district court referred to his as Dr. Cordero. For ease of reference and clarity, this brief will refer to him as Dr. Cordero.

informed that his passes for crutches and bed rest had expired, and that he was required to go back to work. *Id*. To reach his worksite, Kinard had to walk nearly half a mile and climb up and down stairs on a broken foot with no cast, crutches, or cane. *Id.* 33 at 10 (App. 42). He experienced increased swelling, inflammation, and "excruciating" pain. *Id*.

Kinard submitted multiple sick call requests and grievances, attempting to get further medical care for his foot. *Id*. On May 18, 2022, he saw Dr. Cordero for a second time, and was told that the x-rays administered a month prior showed no fracture, only a mild sprain. *Id*. Kinard asked Dr. Cordero to examine his foot because, nearly two months after the fall, it remained "swollen, inflamed, discolored, and very painful." Dr. Cordero did not look at Kinard's foot, told Kinard he was "fine," declined to prescribe any pain medication, and told Kinard to "go back to work." *Id.* at 10–11 (App. 41–42).

Despite the fact that Dr. Cordero told Kinard he was "fine," Kinard was taken for additional x-rays on May 31, 2022. *Id.* at 11 (App. 43). On June 3, Dr. Cordero called Kinard to medical and informed him that, in fact, his foot *was* fractured, and that because he had missed the fracture and delayed treatment for so long, it would take between six months and a year, or even longer, for Kinard's foot to heal. *Id*. Kinard requested pain medication as well as a "lay-in" order, so that he would not be required to work, given the difficulty he continued to have walking the half-mile

to his job on a broken foot, but Dr. Cordero declined these requests and said there was "nothing he [could] do." *Id.* Kinard stated that continuing to have to walk to work on his broken foot was so painful that it felt like his "leg [wa]s on fire." *Id.*

A week later, on June 10, 2022, Kinard was summoned back to medical, and Dr. Cordero told him his foot would be put in an air cast. *Id.* at 11–12 (App. 43–44). Kinard, concerned about the chronic pain and disfigurement in his foot, inquired whether there was a possibility it was not healing correctly. *Id.* at 12. (App. 44). Dr. Cordero stated it was healing "just fine." *Id.*

Later that day, a nurse came to Kinard's room and put a deflated, used air cast on Kinard's foot. *Id.* The nurse had not brought an air canister to fill the cast with air, and informed Kinard she would return the following week to fill it. *Id.* Without air, Kinard's cast did nothing to support or set his broken foot. *Id.* He was provided with nothing more than a large plastic boot that his broken foot moved around within and bumped up against, causing further pain and swelling. *Id.*

The nurse did not return the following week with air, and as of the time of filing, Kinard had yet to receive air in his air cast. *Id.* at 12, 13–14 (App. 44, 45–46). For months, whenever he had had to walk anywhere in the prison, including his worksite and the medical department, he wore a loose boot with a deflated air pouch that provides "no support." *Id.* at 13–14 (App. 45–46). This led to "severe chronic pain." *Id.* at 14 (App. 46).

On June 23, 2022, Kinard was given a copy of his medical record, which indicated that the medical department had issued a series of passes for various restrictions on activity and accommodations because of his broken foot, but they had never given Kinard the passes and none of these accommodations were in place. *Id.* at 12 (App. 44). Kinard put in a sick call to request the passes. *Id*.

On June 27, 2022, Kinard was called to the medical department and given the passes, which had been issued for the following: "no pulling or lifting 15 lbs, low bunk pass, adaptive device, no standing over 10 minutes, with 5 minute rest in between" *Id.* at 12–13 (App. 44–45). Notably, the passes did not address or eliminate the requirement that Kinard walk half a mile to and from his work site daily on a broken foot. *Id*.

On July 8, 2022, Dr. Cordero met with Kinard and informed him that his foot was not healing correctly—it was "overlapping"—and that he would put in a request for Kinard to see an orthopedic surgeon. *Id.* at 13 (App. 45). Kinard signed paperwork to start this referral process, and then attempted to advocate with Dr. Cordero to have air put in his air cast, which he had been wearing for nearly a month with no air. *Id*. Dr. Cordero did not respond to this request or make any attempts to fill Kinard's cast with air or acquire a more suitable cast or brace, instead stating "this concludes the meeting." *Id*.

Kinard's injury significantly impacted his life in prison. At the time of the filing of his complaint, he wrote that he "suffers daily" from walking on his broken foot in the uninflated air cast. *Id*. at 14 (App. 46). He continued to have to walk a half-mile each way to and from work, and he had to walk through long hallways and climb stairs to go anywhere in the prison, including to the medical department to see Dr. Cordero. *Id*. Because he did not have a lay-in or bedrest order, he had to report to work every day or risk placement in solitary confinement. *Id*. He also could not access the yard or participate in "recreation and other physical exercise," which isolates him. *Id*. at 16 (App. 48). Further, Kinard feared for his safety, worried that if a fight breaks out the in prison, he would be unable to get out of harm's way quickly due to his limited mobility. *Id*.

On August 17, 2022, Kinard filed a lawsuit concerning the foregoing events. ECF No. 1 at 1–25 (App. 8–32). He alleged that Defendants violated the Americans with Disabilities Act (ADA), Rehabilitation Act (RA), and Eighth Amendment. *Id*. On March 20, 2023, Kinard filed an Amended Complaint. ECF 33. Defendants moved to dismiss. ECF Nos. 49, 50 (*see also* App. 5). On January 22, 2024, the district court dismissed Kinard's complaint. ECF Nos. 60, 61 (App. 56–79, 80–81). It held that Kinard had failed to plead allegations adequate to show deliberate indifference or supervisory liability for his Eighth Amendment claims. ECF No. 60 at 10–20 (App. 65–75). It further dismissed Kinard's ADA and RA claims on the

grounds that (1) he did not identify a program or service to which he was denied access; and (2) that failure to provide medical care is not actionable under the ADA. *Id*. at 20–23 (App. 75–78). On February 2, 2024, Kinard timely filed a notice of appeal. ECF No. 62 at 1 (App. 80).

This Court reviews a district court's grant of a motion to dismiss de novo. *See Ellis v. Cartoon Network, Inc*., 803 F.3d 1251, 1255 (11th Cir. 2015). When reviewing a district court's grant of a motion to dismiss, this Court must "take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Dukes Clothing, LLC v. Cincinnati Ins. Co*., 35 F.4th 1322, 1325 (11th Cir. 2022) (quoting *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Because Kinard proceeded *pro se* before the district court, his submissions to the district court must be construed "liberally" and held to "less stringent standards than formal pleadings drafted by lawyers." *Bilal v. Geo Care, LLC*, 981 F.3d 903, 911 (11th Cir. 2020 (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

## SUMMARY OF THE ARGUMENT

The district court erred in dismissing Kinard's claim under the ADA. First, it held that Kinard was not denied meaningful access to any prison services when Kinard listed numerous services that he could only access through extreme pain, including mobility, his prison job, prison medical services, and recreation. Second,

the court held that Kinard's claim failed because it merely alleged medical malpractice rather than a failure to accommodate a disability. The doctrine the district court invoked—that an atextual exception to the ADA exists when the desired accommodation is medical treatment—is not settled law, nor should it be. Even accepting the doctrine, Kinard plainly sought several disability accommodations, including crutches, bed rest, and lay-in order excusing him from work. These would not "treat" his injury but rather accommodate it.

The district court also erred in dismissing Kinard's Eighth Amendment claim against Dr. Cordero. The district court's holding that Dr. Cordero provided some medical care and therefore could not be deliberately indifferent both exaggerated what Dr. Cordero actually did and misstated the law. The district court's conclusion that Dr. Cordero acted out of good-faith medical disagreement lacks any basis in Kinard's allegations and requires making inferences in favor of the movant in a manner that Rule 12 does not permit. This Court should reverse and remand.

## I. Kinard Stated a Claim Under the ADA.[2]

### A. Kinard was denied meaningful access to prison services.

The district court erred when it held that Kinard "identifies no program or service to which he was denied access because of his injury." ECF No. 60 at 22 (App. 77). To the contrary, in Kinard's amended complaint, he clearly names several prison programs and services that he was unable to meaningfully access on his broken foot, including mobility, his prison job, prison medical services, and recreation, all of which have been recognized as programs or services under the ADA. ECF No. 33 at 10, 11, 14, 16 (App. 42, 43, 46, 48).

"[P]rograms, services, and activities" has an expansive meaning in the unique context of prisons, in which public entities have control over all actions of the prisoners in their charge. The Rehabilitation Act, which this Court interprets coextensively with the ADA, expressly defines "program or activity" to mean "all of the operations of … a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b); *see also Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) (explaining that "[d]iscrimination claims under the Rehabilitation Act are governed by the same

_____

[2] Kinard uses the shorthand of "ADA" to refer to both of his disability law claims, as the ADA and RA have identical standards with regards to every live issue in this appeal.

standards used in ADA cases."). In the context of prisons and jails, "programs, services, and activities" includes virtually everything the facility offers, from dining to visitation to educational programming. *See, e.g.*, *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Armstrong v. Schwarzenegger,* 622 F.3d 1058, 1068 (9th Cir. 2010) (holding that "the fundamentals of life, such as sustenance, the use of toilet and bathing facilities, and elementary mobility and communication" inside a prison all constitute a public entity's programs or services); *Mazzola v. Davis*, 776 F. App'x 607, 611 (11th Cir. 2019) (explaining that denying meaningful access to programs and services available to the general prison population, such as "the prison's recreational facilities, dining hall, visitation facilities, library, and commissary," constituted disability discrimination).

Meaningful access requires more than being physically capable of accessing services when doing so risks injury, pain, or humiliation. "A violation of Title II … does not occur only when a disabled person is completely prevented from enjoying a service, program, or activity. The regulations specifically require that services, programs, and activities be 'readily accessible.'" *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) (quoting 28 C.F.R. § 35.150). In *Wright v. New York State Department of Corrections*, for example, a wheelchair-bound plaintiff was able to use a manual wheelchair to access services but it caused him pain, so the Second

Circuit held that banning him from using a motorized wheelchair violated the ADA. 831 F.3d 64, 70 (2d Cir. 2016).

The U.S. Supreme Court's paradigmatic case on Title II of the ADA, *Tennessee v. Lane*, involved plaintiffs with mobility impairments who had to crawl or be carried up flights of stairs to reach the second floor of a courthouse. 541 U.S. 509, 513 (2004). No party suggested that the plaintiffs had meaningful access to the courts even though they could physically reach them by risking injury. Congress in passing the ADA enacted a broader mandate for equality. *See Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134–35 (9th Cir. 2012) (rejecting defendant's argument that it must only provide "necessary" accommodations as that "would require very few accommodations indeed. After all, a paraplegic can enter a courthouse by dragging himself up the front steps, so lifts and ramps would not be 'necessary' … And no facility would be required to provide wheelchair-accessible doors or bathrooms, because disabled individuals could be carried in litters or on the backs of their friends. That's not the world we live in.").

Throughout Kinard's amended complaint, he alleges that his injury limits his mobility. ECF No. 33 at 8 (App. 40) ("plaintiff could hardly walk"); *id.* at 10 (App. 42) (pain from walking caused inflammation and "excruciating" pain); *id.* at 11 (App. 43) (walking a half mile to work, walking long hallways in the prison, and climbing stairs causes such "excruciating pain" that it "feels like [his] leg is on

fire."); *id*. at 13 (App. 45) ("[p]laintiff suffers daily from walking on his foot that has not healed properly."). To aid in his mobility, he sought, at different points, crutches, air in his air cast, and a lay-in order that would eliminate some of his need to walk on a daily basis. *Id.* at 9, 11, 12, 13 (App. 41, 43, 44, 45). In *United States v. Georgia*, the Supreme Court cited "mobility" as a service under the ADA in the prison context. 546 U.S. 151, 157 (2006). Kinard's inability to move about the prison on his feet without considerable pain deprives him of meaningful access to mobility.

Kinard's limited mobility also impacts his access to other prison programs and services. He repeatedly alleges that he is unable to access his work assignment.[3] ECF No. 33 at 9–10, 11, 13–14 (App. 41–42, 43, 45–46). To get to work, Kinard must walk a half-mile in each direction, subjecting him to extreme pain daily. *Id*. If he does not report to work, he will be placed in solitary confinement. *Id.* at 14 (App.

_____

[3] This Court has stated that prisoners with disabilities who seek access to work programs for which they are not qualified to participate do not have valid Title II claims. *See Flournoy v. Culver*, 534 F. App'x 848, 853 (11th Cir. 2013). This is separate from the work access issue Kinard alleges here because he does not seek access to a job he is not qualified to hold. Rather, he seeks a pain-free manner of accessing the job he already has, or permission from prison authorities to stay in bed without risking punishment. Similarly, the position that some courts have adopted that incarcerated workers in prisons are not "employees," *see, e.g., Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991), is inapposite here, because Title I of the ADA, not Title II, governs employer-employee relationships. *See Lundstedt v. City of Miami,* No. 93-cv-1402, 1995 WL 852443, at *13 (S.D. Fla. Oct. 11, 1995) ("Defendants' citation to the definition of 'employer' under Title I of the ADA and the cases involving Title I are inapposite and inapplicable to this action inasmuch as Plaintiff is suing under Title II of the ADA").

46). Kinard has requested and been denied accommodations, such as a lay-in or bedrest order, that would exempt him from this work requirement while his foot heals. *Id*. at 9, 11 (App. 41, 45). Kinard also alleged that, because of his injury, he is unable to "to participate in recreational activities in the prison yard," which isolates him. *Id*. at 16 (App. 48). Additionally, Kinard alleged broadly that he "suffers daily" because he must walk around the prison to get anywhere he is required to go. *Id*. at 14 (App. 46). As alleged throughout the complaint, he is recurrently called to the medical unit, and thus must frequently walk on his broken foot from the dorm to medical to access medical care.[4] *Id.* at 8, 9, 11, 12 (App. 40, 41, 43, 44).

Work, medical services, and recreation are all programs or activities under the ADA. *Yeskey*, 524 U.S. at 210 (listing "medical services" and "recreation" as services, programs or activities under the ADA); *Georgia*, 546 U.S. at 157 (2006) (listing "medical care" as a prison service); *Wright*, 831 F.3d at 73 (holding, in case where prisoner in wheelchair "avoids recreational time in the prison yard because he

---

[4] Significantly, the conclusion that health care is a "service" provided by a public entity is distinct from the doctrine, accepted by some courts and addressed below, that prisoners may not use disability law to bring claims that more appropriately sound in medical malpractice by seeking medical care as a proposed accommodation for their disability. *Jones v. Rutherford*, 546 F. App'x 808, 812 (11th Cir. 2013) (citing *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)). Making a prisoner walk to and from his medical appointments on a broken foot, causing "excruciating pain," is not "medical malpractice" as it is distinct from any issues in the provision of medical care and an appropriate accommodation would be humane transportation or the provision of a mobility aid, not different medical treatment.

fears he would be unable to escape quickly in the event of a prison fight and he feels socially isolated without the ability to move about the yard," that "[u]ndoubtedly, these shortcomings are examples of Wright being denied meaningful access to prison services, programs, and activities."); *Lewis v. Cain*, No. 3:15-cv-318, 2021 WL 1219988, at *54 (M.D. La. Mar. 31, 2021) (analyzing "work assignments" and "duty status" as programs or services under the ADA); *Holmes v. Godinez*, 311 F.R.D. 177, 227 (N.D. Ill. 2015) (holding that prison "job assignment program constitutes 'services, programs, or activities' under Title II of the ADA"). Because Kinard cannot access any of these services without enduring "excruciating" pain, his access is not meaningful.

In holding that Kinard "identifies no program or service to which he was denied access," the district court focused on Kinard's requests for adequate medical treatment. ECF No. 60 at 22 (App. 77). As explained above, medical care is a service under the ADA, *Georgia*, 546 U.S. at 157. Further, this analysis ignores several distinct accommodations that Kinard sought—including a lay-in order, crutches, and an inflated air cast—in order to regain his mobility and access many other services in the prison. The district court was incorrect to overlook these distinct allegations, and this Court should reverse.

**B. The district court erred in holding that Kinard sought accommodations that are not actionable under disability law.**

The district court dismissed Kinard's disability law claims because "the ADA and RA were not intended to subsume medical malpractice claims, meaning allegations that a defendant failed to provide medical care to a disabled inmate does not give rise to claims under the ADA or RA." ECF No. 60 at 22 (App. 77). The district court erred in two respects—this principle is not, and should not become, binding law in this Circuit and even were it to apply it would not control the outcome here.

> 1. *Bryant v. Madigan* is not the law in this Circuit and should not become it.

The Seventh Circuit's decision in *Bryant v. Madigan* has been widely cited for the proposition that the ADA does not provide an alternative cause of action for prisoners seeking to bring medical malpractice claims. 84 F.3d 246, 249 (7th Cir. 1996). In *Madigan*, Judge Richard Posner interpreted the ADA in the common-law style, creating "judge-made exceptions" to the plain statutory text in order to "avoid absurd[]" outcomes, and speculating about what Congress could "really have intended" the ADA to mean. *Id.* at 249. Today, of course, courts reject this approach. Courts do not invent exceptions based on policy preferences and instead interpret statutes according to the ordinary meaning of their plain text. *See, e.g.*, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020) ("Nor is there any such thing as a 'canon

of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception. Instead, when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule."); *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2073 (2018) ("It is not our function to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have intended.") (internal quotation marks omitted); *Magwood v. Patterson*, 561 U.S. 320, 334 (2010) ("We cannot replace the actual text with speculation as to Congress' intent.").

In the years since *Madigan*, courts have made clear that the ADA, including in its application to prisons, is no exception to this approach. For example, parsing the text of the statute, the U.S. Supreme Court has unanimously held that prisons are "public entities" within the meaning of the ADA, and that the "programs, services, or activities" prisons offer, like "recreational 'activities,' medical 'services,' and educational and vocational 'programs,'" are all subject to the ADA's usual requirements. *Yeskey*, 524 U.S. at 210.[5] The Court has also suggested that the failure of a prison to "accommodate [a prisoner's] disability-related needs" in, *inter alia*, its

---

[5] Notably, the majority of the opinion in *Madigan* was dedicated to the opposite conclusion: that the ADA could not apply to prisons because, although "[t]here is no express exclusion of jails and prisons," the Court explained, "[j]udgemade exceptions to laws of general applicability are justified to avoid absurdity." 84 F.3d at 248–49 (citations omitted). In a unanimous opinion drafted by Justice Scalia, *Yeskey* relied on the plain text of the statute to conclude to the contrary. 524 U.S. at 209–10.

provision of medical care, would create liability under the ADA. *Georgia*, 546 U.S. at 157. These decisions illustrate the extent to which *Madigan* is out of step with the correct approach for interpreting and applying ADA.

This Court has never adopted the atextual exception of *Madigan* nor should it. The district court relied only on two of this Court's unpublished opinions. Dkt. 60 at 22–23 (App. 77–78) (citing *Jones v. Rutherford*, 546 F. App'x 808, 811–12 (11th Cir. 2013); *Finn v. Haddock*, 459 F. App'x 833, 837–38 (11th Cir. 2012)). *Jones v. Rutherford* cited *Madigan* in holding that medical care was not a "program, service, or activity" in direct contradiction to the Supreme Court's opinion in *United States v. Georgia* cited above. 546 F. App'x at 811. *Finn v. Haddock* cited *Madigan* as well but its reasoning on this issue was dicta, as defendants were sheriffs not on notice of any need for an accommodation as required under the ADA when they unknowingly arrested a man during a medical emergency. 459 F. App'x at 837–38. *Jones* and *Finn* are neither binding nor persuasive on this record.

One published opinion of this Court has cited *Madigan*, but only for persuasive authority as to an entirely different proposition. *Schiavo ex rel. Schindler v. Schiavo* involved the removal of artificial life support from Terri Schiavo. 403 F.3d 1289 (11th Cir. 2005). Her parents challenged the removal under several authorities, including suing the hospice doing the removal under the ADA. *Id.* at 1294. The hospice, however, was not a public entity and therefore not within the

scope of Title II of the ADA, which governs this appeal. "The ADA," this Court wrote, "was never intended to provide an avenue for challenging court orders in termination of care cases." *Id.* (citing *Madigan* for persuasive authority). This case, of course, is not neither a challenge to a court order nor a termination of care case. Furthermore, this point addressed causation—the hospice acted on the basis of a court order and not on her disability—not a policy-based and atextual exception to disability law based on Congressional intent. Furthermore, analogizing from cases outside prison to prison in the disability context often obscures more than it helps because, as described above, the unique environment of prison makes virtually everything inside a service provided by a public entity and places unique affirmative duties on public officials given their incapacitation of prisoners' ability to service their own needs. *See Lozano v. Collier*, 98 F.4th 614, 628–29 (5th Cir. 2024) (Oldham, J., concurring) (explaining this point in the context of religious liberty statutes, writing, "Inside a prison, everything is different. The baseline is not voluntary choice but involuntary coercion.").

    2. Even were *Madigan* the law in this Circuit, Kinard did not simply seek medical care as accommodations for his disabilities.

The premise of the district court's holding was that Kinard did not seek anything from the prison that would properly be classified as a disability accommodation rather than as medical treatment. Although one would be sufficient,

Kinard sought several disability accommodations not properly classified as medical treatment. These include at different times crutches; bed rest; a lay-in order excusing him from work; a cast; a lower-bunk pass; a "no standing over ten minutes" pass; and more. ECF No. 33 at 9, 11, 12–13 (App. 41, 43, 44–45).

While the rule from *Madigan* has been adopted by several other circuit courts, these same courts also carefully limit its application. Courts have made clear that the judicially created and atextual exception to the ADA applies only to claims brought specifically because of poor medical care. Courts err when they misidentify an allegation that a prison failed to accommodate a disability as an allegation that staff failed to cure an injury—a mistake that causes the unwritten exception to swallow the statute whole.

In a recent Third Circuit case, for example, a prisoner with leg braces brought an ADA claim alleging that he could not safely get in and out of a prison shower. *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 288 (3d Cir. 2019). The district court dismissed his claim, citing *Madigan*. *Id.* at 290. The Third Circuit reversed, as "complaints about not being provided an accessible shower are not allegations of medical malpractice or disagreements about medical treatment. They are requests for reasonable accommodations so that inmates with disabilities can take a shower— just like able-bodied inmates" *Id.* at 291.

The Ninth Circuit has had to reverse district courts for making this exact error three times in the last three years. In *Munoz v. California Department of Corrections and Rehabilitation*, the plaintiff was placed on a top bunk despite a history of knee problems. 842 F. App'x 59, 62 (9th Cir. 2021). The district court held that such placement was not a disability accommodation but rather medical treatment and therefore excluded from the ADA. *Id*. The Ninth Circuit disagreed, holding that "Munoz does not argue he was denied adequate treatment for his knee injuries, only that he was denied an accommodation for his disability." *Id*.

In *Barker v. Osemwingie*, a plaintiff sued a California prison after he was injured by two prison officials who used a device to transfer him from his wheelchair to his toilet. No. 20-15503, 2021 WL 5564625, at *1 (9th Cir. Nov. 29, 2021). The magistrate judge recommended dismissing his Title II claim because his claim purportedly addressed the adequacy of his medical care, citing to *Madigan*. *Barker v. Osemwingie*, No. 2:16-CV-3008, 2017 WL 3454443, at *4 (E.D. Cal. Aug. 11, 2017), *report and recommendation adopted*, No. 2:16-CV-3008, 2017 WL 6512882 (E.D. Cal. Dec. 20, 2017). The Ninth Circuit reversed, holding that "the district court improperly relied on [the principle from *Madigan*]" because "[t]ransferring an inmate from a wheelchair to the toilet is an accommodation to provide access to toileting services, rather than medical treatment for a disability." *Barker*, 2021 WL 5564625, at *1.

And in *Morris v. California*, an incarcerated plaintiff with a mobility impairment sued California for denying him a wheelchair and transfer to a wheelchair-accessible facility. No. 21-16059, 2022 WL 2901730, at *1 (9th Cir. 2022). The district court held that these accommodations were medical treatment, and so not actionable under the ADA. *Morris v. California*, No. 19-cv-02620-HSG, 2020 WL2079277, at *3 (N.D. Cal. 2020). The Ninth Circuit reversed, because "[t]he district court erred in construing Morris's requests as exclusively for medical treatment" and not also as an accommodation. *Morris*, No. 21-16059, at *1.

Kinard's allegations plainly describe the denial of disability accommodations. A lower-bunk pass, for example, is a disability accommodation, not medical treatment, allowing prisoners with injuries to access a safe place to sleep which, as described above, is a public service. *See Munoz*, 842 F. App'x at 62. Excusal from work that would cause excruciating pain is the same—it does not "treat" a foot injury in any meaning of the term. Crutches allow those with mobility disabilities to safely access services of the prison; they do not "treat" foot injuries. *See Durham v. Kelley*, 82 F.4th 217, 226 (3d. Cir. 2023); *Kruger v. Jenne*, 164 F. Supp. 2d 1330, 1337–38 (S.D. Fla. 2000); *Lewis*, 2023 WL 7299130 at *28 ("Plaintiff's experts observed several instances where patients were not timely provided crutches…"). Even a cast, which is the closest thing in Kinard's list of accommodations to medical care, is often treated as a disability accommodation. *Gaston v. Henry Ford Health*, No. 2:23-

cv-12483, 2023 WL 8788946, at *3 (E.D. Mich. Dec. 19, 2023); *Anderson v. Vangerwen*, No. 0:22-cv-00246, 2021 WL 4750564, at *10 (E.D. Cal. Oct. 12, 2021); *Coleman v. City of Los Angeles*, No. 16-v-2577 PSG, 2016 WL 11266893, at *1 (C.D. Cal. July 6, 2016). The district court erred in holding that Kinard solely alleged medical malpractice rather than seeking disability accommodations, and this Court should reverse.

## II.    The District Court Erred in Dismissing Kinard's Eighth Amendment Claim.

"To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). First, a plaintiff must show a serious medical need. *Id.* Defendants did not contest that Kinard's medical need was serious before the district court nor did the district court entertain that it may not be. ECF No. 60 at 14 (App. 69). Second, a plaintiff must prove that the prison official acted with an attitude of "deliberate indifference" to that serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). To meet this standard, defendants must subjectively be aware of a risk of serious medical need and disregard it. *Id.*; *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

"Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the

nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). "[G]rossly inadequate care" may constitute deliberate indifference, as can the "decision to take an easier but less efficacious course of treatment." *Id.*

The district court made two main errors in granting Defendants' motion to dismiss. First, it held that Dr. Cordero could not be deliberately indifferent because he provided Kinard *some* medical treatment: "crutches, Ibuprofen, an ace bandage, various medical passes, and an air cast." ECF No. 60 at 14 (App. 69). This conclusion is wrong on both the law and the facts. As a legal matter, Dr. Cordero "simply misstates the controlling law when he argues that his provision of medical care to [plaintiff] precludes an Eighth Amendment claim." *McElligott*, 182 F.3d at 1259; *see also Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989) (rejecting defendant's argument that "if a doctor follows established medical procedures and actually treats a prison inmate, he has satisfied his obligation under the Eighth Amendment"). On the facts, Kinard alleges that crutches were given but then taken back. ECF No. 33 at 9 (App. 41). Staff gave him his "passes" only after Kinard noticed them in his medical records and alerted staff he was not receiving them; regardless, they were disability accommodations such as "no pulling or lifting 15 lbs," and not medical treatment. ECF No. 33 at 12–13 (App. 44–45). Kinard's air cast was never filled with air, making it worse than useless. ECF No. 33 at 13 (App.

45). This leaves a bandage and ibuprofen as the medical treatment given to a man with a fractured foot, swollen, discolored, and causing excruciating pain with every step. Dr. Cordero's scant medical treatment does not establish as a matter of law that he was not deliberately indifferent.

Second, the district court held that Kinard alleged mere good-faith disputes over which medical treatment was appropriate, disputes which are indeed not actionable under the Eighth Amendment. ECF No. 60 at 15 (App. 70). None of Kinard's allegations support the conclusion that Dr. Cordero was acting out of a good-faith medical disagreement, certainly not as a matter of law, and, operating before discovery, Kinard has had no opportunity to obtain any evidence regarding Dr. Cordero's state of mind. While Dr. Cordero too will have his opportunity to produce evidence that his actions constituted a medical disagreement rather than animus or deliberate indifference, Kinard's allegations do not support that conclusion but rather the opposite. When Kinard asked Dr. Cordero to examine his foot because, nearly two months after his fall, it remained "swollen, inflamed, discolored, and very painful." Dr. Cordero did not look at Kinard's foot, told Kinard he was "fine," declined to prescribe any pain medication, and told Kinard to "go back to work." ECF No. 33 at 10 (App. 42). When Dr. Cordero later informed Kinard that his foot had actually been fractured the whole time, and Kinard requested a "lay-in" so that he would no longer have to work because walking a half-mile to work

was so painful that it felt like his "leg [wa]s on fire," Dr. Cordero refused and did nothing. *Id.* at 11 (App. 43). A week later, Dr. Cordero told Kinard he was finally receiving an air cast but the facility then provided an uninflated air cast, telling him it would fill it up the following week—it never did. *Id.* at 12–13 (App. 44–45). When Kinard told Dr. Cordero that nobody had put any air in his air cast, which he had been wearing for almost a month, Dr. Cordero provided Kinard no response, no attempt to facilitate getting air into his cast, and no suggestion for an alternative cast or brace, instead simply telling him "this concludes the meeting." *Id.* at 13 (App. 45).

The district court concluded that Dr. Cordero simply disagreed in the exercise of his expert medical judgment that he should "put air in Kinard's airless air cast" or prevent him walking on his fractured foot half-a-mile to work each day, every step "feel[ing] like the leg is on fire." ECF No. 60 at 15 (App. 70); ECF No. 33 at 11 (App. 43). This simply does not credit Kinard's allegations. Giving Kinard the inferences he is due, Dr. Cordero did not refuse to put air in his air cast out of a mistaken but good-faith medical judgment that air casts do not require air but rather in knowing disregard of Kinard's injury.

This Court has repeatedly established that district courts may not simply assume that allegations of blatant mistreatment qualify only as good-faith medical disagreements that entitle prison officials to dismissal. In *Steele v. Shah*, a district

court granted summary judgment to a psychiatrist who had taken an imprisoned plaintiff off his psychiatric medication after a brief consultation, holding that the imprisoned plaintiff had "at best" shown "a difference in medical opinion." 87 F.3d 1266, 1269 (11th Cir. 1996). This Court reversed, holding that there may have been a mere difference of medical opinion, but taking the plaintiff's version of the facts, a reasonable jury could conclude otherwise. *Id.*; *see also Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989). In *Goebert v. Lee County*, this Court rejected a defendant's contention that he lacked sufficient awareness of the serious medical need, holding that "[c]hoosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness." 510 F.3d 1312, 1328 (11th Cir. 2007). And in *Rogers v. Evans*, this Court, in reversing a district court, held that evidence that a medical decision "was so wide of the mark as to be far below the minimum standards of medical care" is sufficient to create a fact-issue not only to get past Rule 12 but to get past summary judgment. 792 F.2d 1052, 1060 (11th Cir. 1986). This Court should reverse and remand for further proceedings.

## CONCLUSION

For the forgoing reasons, the district court decision should be reversed and this case should be remanded to the district court.


May 6, 2024

Respectfully Submitted,

/s/ *Samuel Weiss*
Samuel Weiss
RIGHTS BEHIND BARS
416 Florida Avenue NW, #26152
Washington, DC 20001
202-455-4399
sam@rightsbehindbars.org

*Counsel for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume, typeface, and type-style requirements of Rule 32(a) of the Federal Rules of Appellate Procedure and Rule 28-1(m) of the Eleventh Circuit Rules. This brief contains 6,716 words excluding the parts of the document exempted by Fed. R. App. 32(f), as calculated in Version 15.26 of Microsoft Word for Mac 2016. It was prepared in 14-point font using Times New Roman, a proportionally spaced typeface.

/s/ *Samuel Weiss*
Samuel Weiss

**CERTIFICATE OF SERVICE**

I certify that on May 6, 2024, I electronically transmitted the foregoing brief to the Clerk of the Court using the appellate CM/ECF System, causing it to be served on counsel of record, who are all registered CM/ECF users.

/s/ *Samuel Weiss*
Samuel Weiss